STATE OF VERMONT

ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| In re: Atwood-Hood PRD (DP 09-07) | } | Docket No. 116-6-09 Vtec |
| (Appeal of Atwood and Hood) | } | |
|  | } | |
|  | } | |
| In re: Atwood 2-Lot Subdivision (DP 09-05) | } | Docket No. 117-6-09 Vtec |
| (Appeal of Atwood) | } | |
|  | } | |

Decision and Order on Cross-Motions for Summary Judgment

These two consolidated appeals involve a twelve-unit residential development proposed to be constructed on property in the Town of Williston, which was granted "Discretionary Permit" approval by the Development Review Board (DRB) of the Town of Williston in two separate decisions.[1] The proposed twelve-unit development involves three existing parcels of land: one owned by Appellant-Applicants Dana and Brenda Hood and two owned by Appellant-Applicant Jeff Atwood.[2] In Docket No. 116-6-09 Vtec, Appellant-Applicants Atwood and Hood (Applicants) appeal certain

---

[1] The Interim Unified Development Bylaw for the Town of Williston, adopted on July 22, 2008 (2008 Development Bylaw), uses the term "Discretionary Permit" to refer to all the types of approvals within the jurisdiction of the DRB, as contrasted with the "Administrative Permits" issued directly by the zoning administrator. See 2008 Development Bylaw, ch. 5 (discussing "Administrative Permit Procedures"), ch. 6 (discussing "Discretionary Permit Procedures"). Thus, the term "Discretionary Permit" encompasses DRB decisions on conditional use applications, subdivision applications, site plan applications, and applications for planned residential developments (PRDs).
[2] The parties have not provided the applications or any map, plan, or diagram of the proposed developments.

1

conditions imposed in a decision of the DRB, in which the DRB granted Discretionary Permit approval to Applicants for a nine-unit Planned Residential Development (PRD), with conditions. In Docket No. 117-6-09, Applicant Atwood appeals certain conditions imposed in a decision of the DRB, in which the DRB granted him Discretionary Permit approval, with conditions, for the remaining three residential units proposed for the twelve-unit development. Both of the DRB's Discretionary Permit decisions on appeal are contained in the minutes of the DRB's April 28, 2009 meeting.[3] Appellant-Applicants are represented by L. Randolph Amis, Esq.; the Town is represented by Paul Gilles, Esq.

The parties have each moved for summary judgment on the issue of whether the DRB had legal authority to impose several conditions included in the two Discretionary Permit approvals.[4] It is important to note that the Statement of Questions raises no issues regarding whether the Court in this <u>de novo</u> appeal should approve either the three-unit or the nine-unit portion of the development, with or without the contested conditions. Rather, as written, all of the questions in the Statement of Questions

---

[3] The parties have not provided a separate written decision on the two applications. However, the minutes of a DRB meeting at which a decision is made may serve as the written decision required by statute. See 24 V.S.A. § 4464(b)(1) (stating that municipal panel "[d]ecisions shall be issued in writing," and that the "minutes of the meeting [at which the decision is made] may suffice"). For ease of reference, the Court will refer to the April 29, 2009 meeting minutes as the "2009 DRB Discretionary Permit Decision."

[4] Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . . show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." <u>Montgomery v. Devoid</u>, 2006 VT 127, ¶ 9, 181 Vt. 154 (quoting V.R.C.P. 56(c)(3); <u>State v. Therrien</u>, 2003 VT 44, ¶ 8, 175 Vt. 342). When presented with cross-motions for summary judgment, the Court is "directed to consider each motion in turn and to afford the party opposing the motion under consideration the benefit of all reasonable doubts and inferences." <u>In re Delano Variance Application</u>, No. 161-8-07 Vtec, slip op. at 4 (Vt. Envtl. Ct. Aug. 28, 2008) (Durkin, J.) (citing <u>DeBartolo v. Underwriters at Lloyd's of London</u>, 2007 VT 31, ¶ 8, 181 Vt. 609).

2

address only the authority of the DRB—and hence, the authority of this Court in this de novo appeal—to impose the contested conditions.

The following facts are undisputed unless otherwise noted.

Applicants propose to develop a twelve-unit residential development on an approximately 7.2-acre project parcel, which is composed of three existing parcels of property: two owned by Applicant Atwood and one currently owned by Applicants Hood.[5]  All three parcels of property are bounded on the west by North Williston Road and are bounded on the east by an unrelated residential development known as Allenbrook.  A small roadway known as Lefebvre Lane serves the Allenbrook residential development; Lefebvre Lane cuts through the 7.2-acre project parcel and makes a T-intersection with North Williston Road.

The most southerly of the three existing parcels involved in these appeals (the South Atwood Parcel) is 3.01 acres in area and is undeveloped; its northerly boundary is Lefebvre Lane.  The adjoining parcel to the north of Lefebvre Lane is the Hood Parcel, which is 1.17 acres in area and contains an existing single-family dwelling and a paved driveway.[6]  Adjoining the Hood parcel to its north is the second Atwood parcel (the North Atwood Parcel).  The North Atwood Parcel is 3.02 acres in area and contains an

_____

[5] The project property was located in a Medium Density Residential zoning district under the previous zoning ordinance (the 1990 Zoning Ordinance).  Although the area was also defined as a Medium Density Residential zoning district in the 2008 Development Bylaw, the 2008 Development Bylaw did not yet include provisions regulating the uses and dimensional requirements for the Medium Density Residential zoning district (as well as for several other zoning districts) as of the date on which that bylaw was adopted.  Due to this omission, in reviewing the applications on appeal the DRB applied the use and dimensional provisions for the Medium Density Residential zoning district from the 1990 Zoning Ordinance.  See 2009 DRB Discretionary Permit Decision, at 12.  However, the Statement of Questions does not raise any issue as to the lack of these provisions in the 2008 Development Bylaw or the applicability of the 1990 Zoning Ordinance.

[6]  The house on the Hood parcel has the address of 146 North Williston Road.

existing two-unit residential duplex building and an existing carriage barn.[7]

Class II wetlands and a fifty-foot wetland buffer are located on the northern portion of the existing North Atwood Parcel, as well as "on the southern and western border[s] of the existing Hood Parcel." 2009 DRB Discretionary Permit Decision, at 21. The South Atwood Parcel is comprised entirely of Class II wetlands, the Allen Brook, and associated wetland buffers.

Applicant Atwood intends to purchase the Hood Parcel, which will result in a 7.2-acre project parcel. Through the two Discretionary Permit applications on appeal—Application # DP 09-07 and Application # DP 09-05—Applicants propose to develop a twelve-unit residential development on the resulting 7.2-acre parcel.[8]

Application # DP 09-07 (the 9-Unit Application) proposes a subdivision of the overall 7.2-acre project property and proposes a nine-unit residential development on the resulting southerly portion of the subdivided property. Application # DP 09-05 (the 3-Unit Application) proposes a three-unit residential development on the resulting northerly portion of the subdivided property, including a new residential unit to be developed in the carriage barn.

More specifically, the 9-Unit Application proposes to subdivide the 7.2-acre overall project property into two lots. The subdivision will create a 1.5-acre lot to the north, containing the existing two-unit duplex and carriage barn that were located on the original North Atwood Parcel, and will create a 5.7-acre lot to the south, including land on both sides of Lefebvre Lane and containing the existing Hood dwelling. The 5.7-acre lot is proposed to be further reduced in area by 0.33 acre, as a result of two unrelated boundary adjustments, resulting in a southerly development parcel of 5.37

---

[7] The two-unit duplex building on the North Atwood Parcel has the address of 230 North Williston Road.

[8] Applicants Hood are included in the proposal, and therefore are parties to Docket No. 116-6-09 Vtec, because they still own one of the three parcels involved in the proposed development.

4

acres in area.[9]

Applicants propose to develop a nine-unit PRD on the 5.37-acre parcel, consisting of four new single-family dwellings, the existing Hood single-family dwelling, and two duplex buildings.[10] The 9-Unit Application also proposes to remove the existing driveway on the Hood Parcel; to restore the area of that driveway to wetlands; and to construct an access road connecting the nine-unit development to Lefebvre Lane across one of the associated Class II Wetlands.

The 3-Unit Application, which proposes to develop the resulting northerly 1.5-acre lot, seeks approval to construct an addition to the existing carriage barn and to convert it to a single-family dwelling, as well as to realign the existing gravel loop driveway serving the duplex and to add gravel parking and turnaround areas. As proposed, portions of the gravel driveway and carriage house are located within a Class II wetland buffer.[11]

---

[9] The two boundary adjustments, with property owners to the east of the project property, will require separate permits to be obtained by those property owners prior to final approval of the proposed subdivision.

[10] Facts are in dispute, or at least have not been provided to the Court, regarding the plans for and layout of the proposed development; however, these facts are not material to the current motions.

[11] Because both projects affect a Class II wetland or wetland buffer, Applicants were also required to get a state Conditional Use Determination from the Agency of Natural Resources (ANR) for each proposal. Applicant Atwood obtained a Conditional Use Determination from the ANR for the project proposed in the 3-Unit Application, which permitted him to locate the realigned driveway within a portion of the fifty-foot wetland buffer on the property. As of the date on which Applicants filed their Motion for Summary Judgment, November 20, 2009, they had not yet obtained a Conditional Use Determination from the ANR for the project proposed in the 9-Unit Application.

<u>Town of Williston Growth Management and Sewer Allocation Process Applicable to Residential Subdivision Proposals</u>

Applicants submitted the 3-Unit Application to the DRB on July 25, 2008, and submitted the 9-Unit Application to the DRB on August 7, 2009. Because both applications on appeal were submitted after adoption of the 2008 Development Bylaw, they were reviewed under the provisions of that bylaw. See, e.g., <u>In re Keystone Dev. Corp.</u>, 2009 VT 13, ¶ 5 ("[A] permit applicant gains a vested right in the governing regulations in existence when a full and complete permit application is filed." (citing <u>Smith v. Winhall Planning Comm'n</u>, 140 Vt. 178, 182 (1981))).

Under the 2008 Development Bylaw, Applicants are required to obtain Discretionary Permit approval for the proposed twelve-unit development because the project involves the subdivision of land. 2008 Development Bylaw § 4.3.4.1. However, before a project involving a residential subdivision can receive Discretionary Permit approval, it must also undergo growth management review. See <u>id</u>. § 6.3 (stating that "all residential subdivisions" must undergo growth management review prior to receiving Discretionary Permit approval).

Growth management review is governed by Chapter 11 of the 2008 Development Bylaw, which "establishes a competitive growth management system for residential subdivisions." The primary purpose of the system is to "ensure that residential growth does not exceed the capacity of the town's existing infrastructure." <u>Id</u>. § 11.1.1.1.

Under the growth management system, the DRB is responsible for allocating the number of dwelling units that may be constructed in Williston each year. <u>Id</u>. § 11.4. However, the DRB is limited by two factors in the number of dwelling units it is able to allocate in a given year. First, in a given year the DRB must stay within the Town's "residential growth target," which limits the DRB to allocating a maximum of eighty dwelling units per year through 2015, a number that is set in the Town of Williston Comprehensive Plan (Comprehensive Plan). See <u>id</u>. § 11.3 (explaining the "residential

6

growth target" set in the town's comprehensive plan); Comprehensive Plan § 5.1.2 (setting the "residential growth target" at eighty dwellings per year).[12]

As well as being limited by the "residential growth target" for the Town as a whole, the DRB's power to approve dwelling units that are located within the area served by the municipal sewer system is also "limited to the number of units for which capacity in the sewage treatment plant is available." Comprehensive Plan § 5.1.1. Therefore, the DRB "cannot allocate units for which adequate sewage treatment plant capacity is not available[,] regardless of the [residential] growth target established in the comprehensive plan." 2008 Development Bylaw § 11.5.1.6.

To manage its sewage treatment plant capacity, and to fairly allocate that capacity to proposed projects within the area served by the municipal sewer system, the Town of Williston adopted a Sewer Allocation Ordinance. Municipalities are authorized by state statute, 24 V.S.A. § 3625, to allocate sewage capacity either by adopting a sewer allocation ordinance under 24 V.S.A. §§ 1972 or 1973 (ch. 59), or by adopting zoning bylaws or interim bylaws governing sewer allocation under 24 V.S.A. §§ 4403, 4404, or 4410 (ch. 117).[13] Compare 24 V.S.A. § 3625(a)(1), with §§ 3625(a)(2), (3).

Under the Town of Williston Sewer Allocation Ordinance, decisions regarding the available sewage treatment capacity are made periodically by the Williston

---

[12] See also 2008 Development Bylaw § 11.5.1.2 ("The DRB may allocate only the number of dwelling units allowed by the residential growth target adopted in the town plan." However, this "does not mean that the DRB allocates 80 dwelling units each fiscal year" because the "number of dwelling units previously allocated [in prior years] is deducted from the [residential] growth target for each fiscal year in which those allocations were made, ensuring that an average of no more than 80 dwelling units per fiscal year is allocated.").

[13] The Environmental Court does not have jurisdiction over appeals from governmental action taken under ordinances adopted under 24 V.S.A. §§ 1972 or 1973 (ch. 59); on the other hand, the Court does have jurisdiction to hear appeals from governmental action taken under ordinances adopted under 24 V.S.A. ch. 117, which includes §§ 4403, 4404, or 4410. See 4 V.S.A. § 1001(b) (establishing the Environmental Court's jurisdiction).

Selectboard.  See Town of Williston Sewer Allocation Ordinance § 4.1 [hereinafter Sewer Allocation Ordinance] (stating that the Selectboard shall make the sewer capacity determination "[p]rior to each five-year revision of the comprehensive plan").  The Sewer Allocation Ordinance appears to have been adopted under 24 V.S.A. ch. 59, as authorized by 24 V.S.A. § 3625, rather than having been adopted as a zoning bylaw under 24 V.S.A. ch. 117.  See Sewer Allocation Ordinance § 2 ("This ordinance is adopted pursuant to the provisions of 24 V.S.A. § 3625, in the manner provided in 24 V.S.A., Chapter 59 . . . .").

For the purposes of the present appeals, it is extremely important to understand that decisions regarding the residential growth target are set in the Comprehensive Plan, and that decisions regarding the available sewage treatment capacity are made periodically by the Williston Selectboard under the Sewer Allocation Ordinance.  Neither of these decisions is made by the DRB, and neither of these decisions is made under 24 V.S.A. ch. 117.  See Comprehensive Plan § 5.1.2; Sewer Allocation Ordinance § 4 (2005).  Therefore, this Court does not have jurisdiction over appeals from Selectboard action under the Sewer Allocation Ordinance; instead, such appeals may be made, if at all, to the appropriate superior court under V.R.C.P. 74 or 75, and not to this Court.

Once the Selectboard has determined the available sewer allocation for a particular year, the DRB annually determines which proposed residential subdivision projects will receive growth management approval each year, as well as the number of residential units each approved project will receive.  The DRB performs this function under the growth management provisions of Chapter 11 of the 2008 Development Bylaw.  Each year, the DRB holds a public hearing "at which it reviews all proposed residential subdivisions that cleared pre-application review during the preceding year." 2008 Development Bylaw § 11.4.2.3.  The DRB first divides the proposed projects into three categories: proposed projects within the Town's Growth Center, proposed projects

8

outside the Growth Center but served by the sewer system, and proposed projects outside the sewer service area. Id. § 11.3.2.[14] The DRB then evaluates and ranks the proposed residential subdivisions using the evaluation criteria established in Chapter 11 of the 2008 Development Bylaw.

An applicant seeking a growth management allocation from the DRB must submit a "Growth Management Questionnaire," which is meant to provide information to the DRB regarding the proposed development, prior to the DRB's annual growth management hearing. Id. § 11.4.2.2. The information provided by applicants relates to the Chapter 11 evaluation criteria, which "guide the DRB in awarding points to proposed residential subdivisions based on their implementation of specific goals and objectives of the comprehensive plan." Id. § 11.4.2.4. These criteria include a project's potential to conserve energy, id. § 11.6.1, the percentage of the project dedicated to affordable housing, id. § 11.6.2, the project's mix of dwelling types, id. § 11.6.3, and conservation of open space, id. § 11.6.6, among others.

All of the representations made by applicants in their questionnaires "are binding and must be reflected in the [project's] application for [its] discretionary permit if the proposed residential subdivision receives an allocation of dwelling units." Id. § 11.4.2.2. Once the DRB has scored and ranked the competing developments, it then allocates the number of units available for each upcoming year based on that ranking. Id. § 11.4.2.5.

Unlike the annual sewer allocation decision made by the Selectboard, which is made according to an ordinance adopted under 24 V.S.A. ch. 59, the annual growth

---

[14] This is done because of the fact that the residential growth target, permitting development of eighty residential units a year, is further divided among the three categories of proposals. From the residential growth target in any given year, fifty-six units can be allocated to projects within the Town's Growth Center; twelve units can be allocated to projects outside the Growth Center but served by the sewer system; and twelve units can be allocated to projects outside the sewer service area. Id. § 11.3.2.

management allocation decision is made by the DRB under 24 V.S.A. ch. 117. Because the Environmental Court has jurisdiction over appeals arising under 24 V.S.A. ch. 117, the DRB's annual growth management allocation decision can be appealed to this Court within thirty days of the date on which the growth management allocation decision is issued. See 10 V.S.A. 8504(b); 24 V.S.A. § 4471(a); V.R.E.C.P. 5. DRB decisions not appealed within the thirty-day appeal period become final and cannot later be challenged, either directly or indirectly. 24 V.S.A. § 4472(d).

Growth Management and Discretionary Permit Review for Applicants' Proposed Development

In the present appeals, because both applications involved residential subdivisions, they needed to undergo growth management review prior to being considered for discretionary permit approval; the projects needed to obtain a growth management allocation for the new carriage house dwelling unit proposed in the 3-Unit Application, and for the eight new residential units (four single-family dwellings, and two duplexes) proposed in the 9-Unit Application.

Applicants submitted Growth Management Questionnaires for both projects to be considered in the DRB's annual growth management decision for 2009. In the Growth Management Questionnaire submitted in connection with the 9-Unit Application, seeking allocation for eight new units, Applicants represented that 45% "of the proposed dwelling units will be perpetually affordable at 100% of the area med[ian] income," or 33% will be perpetually affordable at "80% of the area med[ian] income." See Applicants' DP-09-07 Growth Management Questionnaire, at 1 (Feb. 13, 2009).

In its 2009 Residential Growth Management Review and Allocation Decision issued on March 10, 2009, the DRB granted Applicant Atwood one unit of allocation for the proposed carriage house dwelling unit. DRB 2009 Residential Growth Management Review and Allocation Decision, at 5 (March 10, 2009) [hereinafter 2009 DRB Growth

Management Allocation Decision]. The 2009 DRB Growth Management Allocation Decision also granted to Applicants allocations for six of the eight new dwelling units proposed in the 9-Unit Application, on the following phased schedule: two units for fiscal year 2011, two units for fiscal year 2012, one unit for fiscal year 2013, and one unit for fiscal year 2014. Id. Applicants did not appeal the 2009 DRB Growth Management Allocation Decision and it became final. 24 V.S.A. § 4472(d). It therefore cannot be challenged in the present appeal, either directly or indirectly. Id.

On April 28, 2009, based on the growth management allocations to the proposed projects, the DRB approved both the 3-Unit and the 9-Unit application. In approving each project, the DRB imposed several conditions, some of which are contested in the present appeals. With respect to the 3-Unit Application, the DRB imposed the following conditions that are contested by Applicant Atwood in Docket No. 117-6-09:

A. No development, mowing or removal of vegetation shall be allowed within the wetland protection buffer.

B. Architectural plans for the carriage barn and its addition must be submitted to staff and the Historic and Architectural Advisory Committee for review and design advice prior to [final] Administrative Permit approval.

2009 DRB Discretionary Permit Decision, at 13. With respect to the 9-Unit Application, the DRB imposed the following conditions that are contested by Applicants in Docket No. 116-6-09:

B. Prior to Final Plat approval, the applicant shall demonstrate that every effort has been made to relocate the proposed access road and path to a location just east of the wetland and behind proposed units six and seven in an effort to avoid disturbance to the existing wetland.

*　　　　*　　　　*

F. The applicant shall provide details for how perpetually affordable housing will be maintained for the units required to be designated for perpetually affordable housing as indicated by the applicant during the growth management residential phasing process.

11

G.  A signed and recorded Homeowners Agreement must be provided to the Planning Office prior to Final Plat approval.  The agreement must include restrictions on the use of fertilizer and phosphate.

Id. at 25–26.


Questions 1, 2, and 3 in Docket No. 117-6-09 Vtec: DRB's Authority to Impose Condition Regarding Wetlands

In the appeal of the 3-Unit Application, Questions 1, 2, and 3 of the Statement of Questions challenge the DRB's authority to impose Condition A, regarding the regulation of wetlands.[15]  Condition A states that "[n]o development, mowing, or removal of vegetation shall be allowed within the wetland protection buffer."  2009 DRB Discretionary Permit Decision, at 13.

Questions 1 and 2 ask this Court to determine whether the DRB has authority to impose permit conditions regarding wetlands and buffers, even if such conditions are more stringent than the limitations imposed in the ANR Conditional Use Determination for the 3-Unit project.  Question 3 asks whether the ANR Conditional Use Determination issued for the 3-Unit project preempts or limits the Town's authority to regulate wetlands and buffers.  With respect to these three questions, Applicants argue that the Town's Development Bylaw can only regulate those subjects that the Town has been authorized to regulate by the legislature, and that the legislature has not authorized municipalities to regulate wetlands.  Further, Applicants argue that, even if the Town has received such authorization, this authority is limited or preempted by the ANR Conditional Use Determination.

Applicants are correct that a municipality is only permitted to regulate those

---

[15]  As the Court previously noted, Applicants do not, in their Statements of Questions, request the Court in this de novo appeal either to delete or to modify the contested conditions.  Rather, the questions in the Statement of Questions ask the Court solely to determine whether the DRB had the authority to impose the contested conditions.

subjects that have been authorized by the Vermont Legislature. See Town of Williston Charter, 24 V.S.A. app., ch. 156, § 5(b) (allowing the Selectboard to "adopt ordinances on any subject authorized by statute"); Brennan Woods Ltd. P'ship v. Town of Williston, 173 Vt. 468, 471 (2001) ("[A] municipality has only those powers and functions expressly granted to it by the legislature, such additional functions as may be incident, subordinate or necessary to the exercise thereof, and such powers as are essential to the declared objects and purposes of the municipality." (quoting Robes v. Town of Hartford, 161 Vt. 187, 190 (1993))).

Nevertheless, the Vermont Legislature has authorized municipalities to regulate wetlands. By statute, municipalities are specifically enabled to "adopt bylaws to . . . preserve and protect wetlands and other terrestrial and aquatic wildlife habitat." 24 V.S.A § 4414(1)(D)(i). In addition, the introductory language of 24 V.S.A. § 4414 authorizes municipalities to adopt several forms of regulations in their bylaws to address "the purposes established in [24 V.S.A. § 4302]," id. § 4414; those purposes include the "protect[ion] and preserve[ation] [of] important natural and historic features of the Vermont landscape, including . . . wetlands." Id. § 4302(c)(5)(B). Further, in reviewing and approving permit applications under a municipality's bylaws, such as bylaws regulating wetlands, the legislature has empowered the DRB or other municipal panel to "attach additional reasonable conditions and safeguards as it deems necessary to implement the purposes of . . . the pertinent bylaws and the municipal plan then in effect." 24 V.S.A. § 4464(b)(2). These statutory provisions authorize the Town to regulate wetlands through validly adopted bylaws and to impose conditions in permits to implement those bylaws.

The Town has in fact exercised the power granted to it by the legislature by enacting development bylaws that address the protection of wetlands and watershed protection buffers. See 2008 Development Bylaw § 29.8–29.9. The 2008 Development Bylaw also empowers the DRB generally to impose permit "[c]onditions designed to

13

ensure compliance with the requirements of [the 2008 Development Bylaw] . . . , as specifically authorized by 24 V.S.A. § 4464(b)(2)." Id. § 6.6.5. Accordingly, because the legislature has authorized the Town to regulate wetlands through validly enacted bylaws and to impose conditions in permits to implement those bylaws, and because the Town has in fact enacted such bylaws, the DRB has the authority to impose the condition that "[n]o development, mowing, or removal of vegetation shall be allowed within the wetland protection buffer."

However, Class II wetlands and their buffer zones in Williston are not regulated solely through the municipal bylaw; they are also regulated by state statute, which creates a dual regulatory scheme.[16] It was under the state statutory scheme that Applicant Atwood was required to obtain a Conditional Use Determination from the ANR. However, the fact that Applicant Atwood has obtained an ANR Conditional Use Determination, permitting him to locate a driveway within a portion of the fifty-foot wetland buffer, does not preempt the DRB's authority or limit the DRB's authority to impose more stringent conditions. Rather, the state statute provides that "if any bylaw is enacted with respect to any land development that is subject to regulation under state statutes, the more stringent or restrictive regulation applicable shall apply. 24 V.S.A. § 4413.

The municipal provisions require a fifty-foot watershed protection buffer around all Class II wetlands, 2008 Development Bylaw § 29.9.3, and mandate that the buffer remain undeveloped, unless such development falls within one of a few narrow

---

[16]    See 10 V.S.A. § 913(a) ("Except for allowed uses adopted by the panel by rule, no person shall conduct or allow to be conducted an activity in a significant wetland or buffer zone . . . except in compliance with a permit, conditional use determination, or order issued by the secretary."); id. § 1272 (regulating "activities causing discharge or affecting significant wetlands"). The state statutory provisions are further implemented through the Vermont Wetland Rules (Wetland Rules), adopted by the former Vermont Water Resources Board and available on the Vermont Natural Resources Board's website: http://www.nrb.state.vt.us/wrp/publications/wetrule2002.pdf

14

exceptions or a variance is granted by the DRB. Id. §§ 29.9.5, 29.9.7. The state statute regulating wetlands similarly prohibits development within Class II wetland buffers, which are also set at fifty feet, see Wetland Rules § 4.3, unless such development is permitted by rule. 10 V.S.A. § 913(a). However, unlike the 2008 Development Bylaw that prohibits almost all development within a fifty-foot wetland buffer, the state statute and Wetland Rules allow several permitted uses within Class II wetland buffers, see Wetland Rules § 6.2(a)–(t), and also allow other types of development within a Class II buffer if a Conditional Use Determination is granted. See Wetland Rules § 8.5(a) (allowing any use that is not [a permitted use] to be approved as a conditional use within a Class II wetland buffer if the development "will have no undue adverse effect on protected functions" of the wetland).

In the present case, the 2008 Development Bylaw's requirements regarding wetland buffers are "more stringent or restrictive" than are the state statutory provisions and administrative rules regulating wetland buffers. Therefore, the condition implementing § 29.9 of the 2008 Development Bylaw, rather than the Conditional Use Determination condition implementing the state statutory and administrative provisions, controls under 24 V.S.A. § 4413.

Accordingly, the condition that "[n]o development, mowing, or removal of vegetation shall be allowed within the wetland protection buffer," is a condition the DRB has authority to impose under state statute and the municipal bylaws, despite the fact that it is more stringent than the terms of the ANR Conditional Use Determination. In Docket No. 117-6-09 Vtec, Applicants' motion for summary judgment must therefore be denied and summary judgment must be granted to the Town as to Questions 1 through 3 of the Statement of Questions.

In the appeal of the 3-Unit Application, Questions 4 and 5 of the Statement of Questions challenge the DRB's authority to impose Condition B, requiring Applicant Atwood to submit design plans to the Historic and Architectural Advisory Committee (Advisory Committee). Condition B states that "[a]rchitectural plans for the carriage barn and its addition must be submitted to staff and the Historic and Architectural Advisory Committee for review and design advice prior to Administrative Permit approval [under Chapter 5 of the 2008 Development Bylaw]." 2009 DRB Discretionary Permit Decision, at 13.

Question 4 asks the Court to determine whether the DRB has the authority to impose such a condition. If the Court determines that the DRB has the requisite authority to impose Condition B, Question 5 asks whether the "design advice" of the Advisory Committee will "become a condition of the Permit enforceable by the Town."

As discussed in the previous section, the Town can regulate those subjects that it has been authorized to regulate by the Vermont Legislature. See 24 V.S.A. app., ch. 156, § 5(b). By statute, the state has authorized municipalities to establish "design review committees" and "historic preservation commissions," such as the Historic and Architectural Advisory Committee, to "advis[e] appropriate municipal panels, applicants, and interested parties" throughout the permitting process, among other things. 24 V.S.A. § 4433. This statutory provision authorizes a municipality to establish an Advisory Committee with the responsibility for advising applicants, as well as for advising the DRB. The statute also authorizes municipalities to establish "design review districts" for "any area containing structures of historical, architectural, or cultural merit," and to appoint "design review board[s]" to "advise any appropriate

16

municipal panel" regarding design review districts. 24 V.S.A. § 4414(1)(E).[17] In addition, as discussed above, in reviewing and approving permit applications, the legislature has granted municipal panels the statutory authority to impose conditions to implement the municipal bylaws, such as those that govern advisory committees. 24 V.S.A. § 4464(b)(2).

The Town has in fact exercised the authority granted to it by the legislature under 24 V.S.A. § 4433 by establishing the Historic and Architectural Advisory Committee. See 2008 Development Bylaw § 3.5 ("The Historic and Architectural Advisory Committee is a seven-member committee, appointed by the Selectboard under the authority of 24 V.S.A. § 4433."). However, although 24 V.S.A. § 4433 authorizes a municipality to give an advisory committee the responsibility of advising "applicants" or "interested parties," as well as advising the municipal panel, the 2008 Development Bylaw only authorizes the Historic and Architectural Advisory Committee to advise the DRB, not to advise applicants. See 2008 Development Bylaw § 3.5 (The role of the Advisory Committee "in the administration of this bylaw is . . . to review proposed multi-family residential . . . developments, . . . and [to] advise the DRB regarding their compliance with the design standards of this bylaw," as well as to advise the DRB regarding proposed development in the Village zoning district.).

Therefore, even though the 2008 Development Bylaw creates an Advisory Committee to advise the DRB throughout the permitting process, and also empowers the DRB to impose permit "[c]onditions designed to ensure compliance" with the Advisory Committee bylaw provisions, see id. § 6.6.5, it does not empower the Advisory Committee to give advice to applicants. Thus, although the DRB has statutory authority to impose Condition B, requiring Applicant Atwood to obtain the Advisory Committee's design advice before applying for a final Administrative Permit

---

[17] In the present case, no party suggests that the proposed projects are located in a design review district under the 2008 Development Bylaw.

for the project, it does not have such authority in the 2008 Development Bylaw.

Accordingly, in Docket No. 117-6-09 Vtec, both parties' motions for summary judgment as to Question 4 of the Statement of Questions must be granted in part and denied in part, in that the DRB has statutory authority, but does not have municipal authority, to impose Condition B.

Question 5 asks, if Condition B were authorized, whether the "design advice" of the Advisory Committee would "become a condition of the Permit enforceable by the Town." Even if the required consultation with the Advisory Committee were authorized by the 2008 Development Bylaw as well as by statute, Condition B only required Applicant Atwood to submit plans for "review and design advice," that is, to receive the advice of the staff and the Advisory Committee. Nothing in the plain language of Condition B requires Applicant Atwood to make any use of that advice in the 3-Unit proposal, which the Town itself has acknowledged in its motion memoranda on this issue.[18] However, because the Court determined under Question 4 that the DRB has no authority under the 2008 Development Bylaw to issue Condition B, Question 5 is moot.

### Questions 1 and 2 in Docket No. 116-6-09 Vtec: DRB's Authority to Impose Condition Regarding Applicants' Efforts to Relocate Access Road to Avoid Wetland Disturbance

In the appeal of the 9-Unit Application, Questions 1 and 2 of the Statement of Questions challenge the DRB's authority to impose Condition B, requiring Applicants to

---

[18] See Town's Motion for Summary Judgment, Docket No. 117-6-09 Vtec, at 2 (Oct. 22, 2009) (stating that "[t]he use of 'advice' [in Condition B] does not signify a mandate. Applicants must submit their plans to staff and the committee, but need not alter their design to suit their advice"); Town's Response to Appellants' Motion for Summary Judgment, Docket No. 117-6-09 Vtec, at 2 (Dec. 28, 2009) (stating that the condition is not a "mandate" but only a "process" that Applicants must comply with before a final permit can be issued).

make "every effort" to relocate the proposed access road and path "in an effort" to avoid disturbance to the existing wetland. Condition B states that "[p]rior to Final Plat approval, the applicant shall demonstrate that every effort has been made to relocate the proposed access road and path to a location just east of the wetland and behind proposed units six and seven in an effort to avoid disturbance of the existing wetland." 2009 DRB Discretionary Permit Decision, at 13.

Question 1 asks the Court to determine whether the DRB has authority to impose such a condition. Question 2 asks more specifically whether the DRB has such authority, in light of the fact that the DRB "has permitted crossing the described wetland so long as the applicant[s] receive[] a [Conditional Use Determination] from the Vermont ANR Water Quality Division to do so," and the fact that the condition "requires Applicants to negotiate with recalcitrant and uncooperative abutters for rights to cross and use land the Applicants may not own."

As discussed above with regard to Condition A of the 3-Unit Application, the legislature has authorized municipalities to regulate wetlands in their bylaws and has authorize municipal panels to impose conditions to implement those bylaws, and the Town has exercised that authority by enacting bylaws that address the protection of wetlands and that authorize the DRB to impose permit conditions to implement those bylaws. Therefore, under state law and the municipal bylaws, the DRB has the authority to impose conditions to implement the purposes of those bylaws regulating wetlands and buffers. See 2008 Development Bylaw §§ 29.8–29.9. Further, such conditions may be more stringent than the ANR's requirements in approving such a project under state law and regulations. 24 V.S.A. § 4413.

Under the 2008 Development Bylaw, Class II wetlands generally must "remain in their natural vegetation," but such wetlands may "be crossed by roads, trails, or utility lines where there is no feasible alternative to such a crossing." 2008 Development Bylaw § 29.8.2 (emphasis added). Because the 9-Unit Application proposes to construct

19

an access road and recreational path across the Class II wetland, under the 2008 Development Bylaw the DRB is required to determine if there is a "feasible alternative" to such a crossing. An alternative location for the access road, slightly to the east, would avoid the wetland and fulfill the purposes of § 29.8.2. However, in order to relocate the access road to the alternative location, Applicants must obtain permission from the Allenbrook Home Owners Association. If Applicants cannot obtain that permission, then the alternative is not feasible. Therefore, in order to implement § 29.8.2, the DRB has authority to require that Applicants make every effort to obtain permission from the Allenbrook Home Owners Association to relocate the access road and minimize disturbance to the wetlands.

Although Question 2 only poses the issue in terms of whether the Town has the authority to impose the contested condition, Applicants also argue in their memoranda of law that Condition B "is arbitrary and capricious in that it defines no reasonable standard of completion except the say so of the staff and it provides no process for the applicant to appeal the determination of the applicant's noncompliance by the staff." Appellants' Motion for Summary Judgment, Docket No. 116-6-09 Vtec, at 2 (Nov. 20, 2009). As to a process for appeal, if the DRB were to deny Final Plat approval on the basis of Applicants' failure to make "every effort" to obtain the alternate route for the access road, that denial would be appealable to this Court. See 10 V.S.A. 8504(b); 24 V.S.A. § 4471(a); V.R.E.C.P. 5.

As to whether Condition B imports a "reasonableness" standard for determining whether Applicants will have made the required level of effort, it is premature to address this issue until or unless the DRB were to determine that a particular level of effort on the part of Applicants was in fact insufficient. All that the Town states is required under Condition B is that Applicants show that they have made a good-faith attempt to negotiate an agreement with the Allenbrook Home Owners Association for the alternative access. See Town's Motion for Summary Judgment, Docket No. 116-6-09

20

Vtec, at 2 (Oct. 22, 2009) ("If Applicants fail to negotiate a solution with [the] Allenbrook [Home Owners Association], the subdivision permit is still valid. Only if [Applicants] fail to try will the condition not be met.").

By the terms of the contested condition, and the Discretionary Permit approval as a whole, if Applicants fail to reach an agreement for an alternative access, the DRB has otherwise already approved the access road across the wetland, conditioned only on obtaining approval from the state ANR for that particular portion of the project. Accordingly, the DRB has authority to impose Condition B, requiring Applicants to demonstrate that "every effort has been made to relocate the proposed access road and path." Summary judgment as to Questions 1 and 2 of the Statement of Questions in Docket No. 116-6-09 Vtec, as to the DRB's authority to impose Condition B, must therefore be entered in favor of the Town.

Questions 3 and 4 in Docket No. 116-6-09 Vtec: DRB's Authority to Impose Conditions Regarding Perpetually Affordable Housing and Growth Management Allocation Phasing

In the appeal of the 9-Unit Application, Questions 3 and 4 of the Statement of Questions challenge the DRB's authority to impose Conditions F and G, requiring Applicants to designate a portion of the development for perpetually affordable housing. Condition F states that "applicant shall provide details for how perpetually affordable housing will be maintained for the units required to be designated for perpetually affordable housing as indicated by the applicant during the growth management residential phasing process." 2009 DRB Discretionary Permit Decision, at 26. Condition G requires that a "signed and recorded Homeowners Agreement must be

provided to the Planning Office prior to Final Plan approval.  Id.[19]

Question 3 asks this Court to determine whether the Town has authority "to require the Applicant to dedicate any of the proposed units to perpetual affordability as set forth in Conditions G and F of the Permit when the Town has allocated too few sewer allocations to the project initially and has called for phasing of the additional units over too long a period of time so that it is financially impossible for the affordability requirements to be met without undue financial sacrifice by the Appellants."  Question 4 asks whether the Town "forfeit[ed] its ability to phase sewer allocations over more than one year when it requires Applicants to dedicate units as perpetually affordable in conformance with the Town Plan, State law and its ordinances."

Both Question 3 and Question 4 refer to the DRB as "requir[ing]" Applicants "to dedicate . . . proposed units to perpetual affordability."  However, the "requirement" that Applicants dedicate a percentage of units to affordable housing is derived from the commitments that Applicants themselves proposed in their Growth Management Questionnaire, in order to obtain points during the DRB's growth management allocation determination.   See Applicants' 9-Unit (DP-09-07) Growth Management Questionnaire, at 1 (representing that 45% "of the proposed dwelling units will be perpetually affordable at 100% of the area medi[an] income," or 33% will be perpetually affordable at "80% of the area medi[an] income," and "indicating which units will be affordable"); Applicants' Motion for Summary Judgment, Docket No. 116-6-09 Vtec, at 4 (Nov. 20, 2009) (stating that Applicants "designed the project for the affordable housing scoring system promoted by the Town [in] its Growth Management Ordinance").  All of the representations made by Applicants in their Growth Management Questionnaire,

---

[19] Condition G does not by its terms mention affordable housing; however, Question 3 refers to Condition G in the context of requiring the applicant to dedicate proposed units to "perpetual affordability."

including which units would be dedicated to perpetually affordable housing, became binding on Applicants once the DRB's 2009 Growth Management Allocation Decision became final. 2008 Development Bylaw § 11.4.2.2. Section 11.4.2.2 prevents applicants from obtaining points in the scoring system on the basis of affordable housing preferences, and then failing to construct the promised units as affordable units.

Question 4 similarly seeks to challenge the DRB's authority to phase the project's sewer allocations over more than one year. However, the DRB's decision regarding the phasing of sewer allocations for the proposed project was also made in the 2009 DRB Growth Management Allocation Decision, not in the decision on appeal in the present case. Applicants themselves acknowledge that it is the DRB's March 10, 2009 "phasing" or "Growth Management" Allocation Decision that they seek to challenge. See Applicants' Motion for Summary Judgment, Docket No. 116-6-09 Vtec, at 3–4 (challenging the "Growth Management Decision of the DRB" and asking the Court to remand "the phasing decision of the DRB" in light of Applicants' arguments). Applicants failed to appeal the March 10, 2009 DRB Growth Management Allocation Decision and it has become final. 24 V.S.A. § 4472(d). Therefore, Applicants cannot now challenge that decision in the present appeal, either directly or indirectly. Id.

Accordingly, Questions 3 and 4 of the Statement of Questions in Docket No. 116-6-09 Vtec must be dismissed as they raise issues beyond the scope of the current appeal. See, e.g., Appeal of Yates, No. 158-9-04 Vtec, slip op. at 6–9 (Vt. Envtl. Ct. Apr. 17, 2007) (Durkin, J.) (dismissing several issues "on the basis that they [were] impermissible collateral attacks on previous DRB approvals and [were] therefore outside the scope of [the] appeal").

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that the parties' Motions for Summary Judgment are GRANTED in part and DENIED in part, as follows.

In Docket No. 117-6-09 Vtec, the Town's Motion for Summary Judgment is GRANTED and Applicants' Motion for Summary Judgment is DENIED on Questions 1 through 3 of the Statement of Questions, in that the DRB has authority to impose Condition A on the 3-Unit proposal, despite the fact that it is more stringent than the terms of the ANR Conditional Use Determination. Both parties' Motions for Summary Judgment are GRANTED in part and DENIED in part on Question 4 of the Statement of Questions in that the DRB has authority by statute, but not by the 2008 Development Bylaw, to impose Condition B on the 3-Unit proposal. Both parties' Motions for Summary Judgment are DENIED as to Question 5 of the Statement of Questions, as it has become moot in light of the Court's ruling on Question 4.

In Docket No. 116-6-09 Vtec, the Town's Motion for Summary Judgment is GRANTED and Applicants' Motion for Summary Judgment is DENIED on Questions 1 and 2 of the Statement of Questions, in that the DRB has authority to impose Condition B on the 9-unit proposal. Questions 3 and 4 of the Statement of Questions are DISMISSED, as they raise issues that are beyond the scope of the current appeal.

This Decision and Order appears to conclude both appeals, as the Statement of Questions did not ask this Court to take any action with regard to the applications in these de novo appeals. Therefore, the Court will enter a final judgment order in this matter, effective on March 26, 2010.


Done at Berlin, Vermont, this 18th day of March, 2010.


_____
Merideth Wright
Environmental Judge